IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 14, 2006

## STATE OF TENNESSEE v. THOMAS EARL BRADSHAW

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2004-B-1763        J. Randall Wyatt, Jr., Judge**

_____

**No. M2005-01232-CCA-R3-CD - Filed March 24, 2006**

_____

The Defendant, Thomas Earl Bradshaw, pled guilty to one count of aggravated burglary and one count of especially aggravated robbery, and the trial court sentenced him as a multiple offender to an effective sentence of thirty-six years imprisonment. The Defendant filed a motion to withdraw his guilty pleas, which the trial court denied. On appeal, the Defendant contends that the trial court erred when it denied his motion to withdraw his pleas. Finding that there exists no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal) and Michael Colavecchio, Nashville, Tennessee (at guilty plea hearing) for the Appellant, Thomas Earl Bradshaw.

Paul G. Summers, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Kathy Morante, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's alleged robbery and burglary of several homes for which the Defendant was indicted for one count of robbery, four counts of aggravated burglary, one count of especially aggravated robbery, three counts of aggravated robbery, one count of attempted aggravated robbery, and one count of aggravated assault. At the hearing on the Defendant's guilty plea held January 24, 2005, the trial court first noted that there were some negotiations between the State and the Defendant regarding a guilty plea. After a recess, the Defendant's attorney told the

court that the Defendant would not be pleading guilty but that he wanted to address the court. The Defendant told the court that the parties were not communicating. The trial court noted that the parties had been in negotiations for three hours and that the Defendant would have lunch, change clothes, and the trial would start at 1:00 p.m. The Defendant told the trial court that he was not going to get a fair trial, and the trial court assured the Defendant that the trial would be fair but informed the Defendant that he could not play games to delay the trial.

At 1:00 p.m. the parties returned to court and announced that they had reached a plea agreement. The State's attorney said that the agreement reached was that the Defendant was going to plead guilty to aggravated burglary and receive a sentence of six years at thirty-five percent. The State's attorney said that the Defendant would also plead guilty to especially aggravated robbery and receive a sentence of thirty years at one-hundred percent. The agreement included that these sentences would run consecutively to one another and consecutively to a sentence that the Defendant was currently serving. In accordance with this agreement, the State would dismiss the other nine counts against the Defendant.

The trial court explained to the Defendant the charges to which he was pleading guilty and the possible punishment for those charges. The sentence was also explained to the Defendant. The trial court asked the Defendant if he understood that his case was set for trial that morning, that the witnesses were present, and that the court was ready to give the Defendant a trial. The court asked the Defendant if he wished to plead guilty, and the Defendant said, "Yes." The trial court explained the procedures that would have taken place had the case gone to trial, the Defendant's right to cross-examine witnesses, the Defendant's right to testify, his right to call witnesses on his behalf, and his right to appeal any finding of guilt by the jury. The Defendant indicated that he chose to waive those rights. The Defendant indicated that his attorney had been over the Defendant's petition to waive his rights and said that his attorney had read the form to him and the two had discussed the form. The trial court explained that the Defendant was pleading guilty, and the Defendant indicated that his decision to plead guilty was voluntary.

The State's attorney told the trial court:

As Your Honor knows, the [S]tate was ready to go forward today on all of the counts. And the proof in this case would have shown that on April 22nd of 2004, Ms. Nell Vogel, who's seventy-two years old and lives by herself, was out in her driveway area and went into her back door. And there was a man in her house who demanded money and looked though her purse and forced her into the back bedroom in order to get those things. Ms. Vogel lives near railroad tracks.

On April 23rd, 2004, in an area very near where Ms. Vogel lived, Mrs. Greer, who's seventy years old, was out in her yard. She was grabbed around the neck from behind and knocked to the ground by a man, who had a lawnmower blade in his hand. She screamed for her husband, who was in the garage. The man threatened to kill her if she didn't shut up. Mr. Greer, who was seventy-three, came out at that

-2-

time.  The man demanded a wallet from Mr. Greer.  He didn't have a wallet on him.  He took rings off of Mrs. Greer's hand.  She was able to get away and call police.

Later, that same day, Detective Chastain located those same rings at a pawn shop.  They had been pawned by a man named Carl Jones.  He was located and arrested by the detectives.  Despite his arrest, the railroad robberies continued.  The Greer's home, also, was near the railroad tracks.

On April 28th of 2004, Mrs. Campbell, who is seventy-one years old and lives by herself[,] was taking out the trash when she saw -- she came back in and there was a man in her house, armed with a knife.  He covered her mouth, manhandled her, causing bruises, demanded money and jewelry.  He picked up an envelope, which had some money in it and took the money.

At this time, Detective Chastain was still investigating to see if Mr. Jones, who pawned the jewelry was, in fact, the railroad robber.  He did not [fit] the physical description given by the earlier victims.  A photo lineup containing Mr. Jones'[s] picture was given to Ms. Vogel.  She did not identify him as the man who committed the robbery.  Mr. Greer said it was not the man.  And Mrs. Campbell said it was not him.

The Detective talked to Mr. Jones.  Mr. Jones who has been brought over from Turney Center and is prepared to testify on behalf of the [S]tate would have testified that he knew [the Defendant] from prison, that they ran into each other, with a third person named Kevin.  [The Defendant] asked Mr. Jones to pawn the items, claimed he didn't have an I.D. on him.  [The Defendant] and Mr. Jones went to the pawn shop.  And they got a hundred and twenty dollars for that jewelry.  [The Defendant] gave Mr. Jones somewhere between twenty and forty dollars and some cigarettes as an exchange for Mr. Jones being the one who, in fact, had pawned them.  Mr. Jones was still locked up, both on pawning these items and a Probation Violation, himself.  And despite the fact that he was locked up, the railroad robberies did continue.

On May 9th of 2004, which was Sunday and Mother's Day, Mrs. Carpenter, an eighty-eight year old widow had been outside with some mail, had walked back in, cleaning some strawberries at her kitchen sink, when a man approached her from behind and grabbed her, said he didn't want to kill her, that he just wanted some money.  He had a knife with him.  He dragged her about the house, causing some severe injuries to her arm.  The only money she had was nine dollars plus fifty dollars, which was her Sunday church offering, which he took.  She asked the [D]efendant if he didn't know that it was Mother's Day and didn't he have a mother.  She also explained that when he demanded more money that she was a widow and had no more money.  He picked up a bank envelope and an Avon receipt and took

that with him, along with the money that he took.

Officers were called to the scene and put in a K-9 unit. The K-9 was able to pick up a scent to railroad tracks, which were not far from M[r]s. Carpenter's home. The K-9 followed the scent on the tracks for a ways, lost the scent. But, before losing the scent, the K-9 Officer picked up the Avon receipt and bank envelope, which w[ere] taken from Mrs. Carpenter's home.

Finally, on May 12, 2004, Ms. Goodson, who was seventy-six years old[,] was outside the back of her home. She lives very near the Vogels and the Greers and had heard about the elderly railroad . . . robberies. And she saw a man and realized there was something not right. She ran to her house and tried to lock the door, but she was not fast enough. Her husband was out mowing the front lawn and didn't know anything was the matter. He threatened to kill her. He dragged her throughout the house, causing her some bruising. He took from her jewelry, cash, and a collection of state quarters that she had. In addition, as he was leaving, he saw a handgun up on a shelf. And he grabbed that. She had the presence of mind to hit her alarm button as he was leaving, which called the police and let off quite a loud sound.

The police having been investigating th[is] series of robberies for some time, were on the scene very quickly. An officer saw a man matching the description of the suspect on some railroad tracks that was calling to the dispatcher. Another officer, Officer Murphy, answered the call. This was on Metroplex Road near some railroad tracks. He saw the suspect there holding a gun. He told the man to stop and drop the gun. Instead of doing that, the suspect aimed at the officer. The officer fired first but did not hit the suspect. The suspect ran. Helicopters were there. A K-9 Officer was there. I-24 was shut down because of all of this that was going on. And eventually, the K-9 Unit was able to find the suspect [lying] in very tall grass. That turned out to be . . . the [D]efendant. They found a short time later, perhaps, the next day, the state quarters that had been stolen from the last robbery buried in the ground -- in the dirt near the ground where he was [lying]. They took him back to Ms. Goodson's home. And she immediately identified him as the man that had just robbed her.

A photo lineup was conducted with [the Defendant] in it. And on this occasion, Ms. Vogel saw, identified him, and began to cry. Mr. Greer identified him. The envelope in Mrs. Campbell's home which had the money in it had [the Defendant's] prints on it. The Avon and bank receipts for Mrs. Carpenter's home, which the K-9 Unit had retrieved earlier had [the Defendant's] prints on it.

After this recitation of the facts, the trial court asked the Defendant how he wanted to plead to the charge of aggravated burglary. The following occurred:

-4-

[The Defendant's Attorney]:  You've got to say guilty out loud.
THE COURT:  Try, again. Count 6, on a charge of Aggravated Burglary, what is your plea, guilty or not guilty?
(Pause in the proceedings while the [D]efendant confers with [his attorney].)
THE COURT: Okay.  Count 6, Aggravated Burglary, what is your plea, guilty or not guilty?
THE DEFENDANT:  Yeah.
THE COURT:  Are you saying guilty?
THE DEFENDANT:  Uh, huh.  Yeah.
THE COURT:  Can you say the word "guilty" or "not guilty"?  Which is -- what is your plea?
THE DEFENDANT:  Yeah.
THE COURT:  Yeah, what?
(Pause in the proceedings while the [D]efendant confers with [his attorney].)
THE DEFENDANT:  I plead guilty.

The trial court asked the Defendant how he would like to plead with respect to the charge of especially aggravated robbery, and the Defendant again continually responded "Yeah."  The trial court informed the Defendant repeatedly that he must say guilty or not guilty, and the Defendant finally said that he would plead guilty.  The trial court accepted the guilty pleas and imposed the agreed sentence.

On February 16, 2005, the Defendant filed a motion to withdraw his guilty pleas alleging that his pleas were the product of duress and were not voluntarily entered.  He asserted that he was under the impression that the court date when he entered his guilty plea was actually supposed to be for plea negotiation.  Therefore, he asserted, he was under duress since he was induced to make a plea agreement.  Further, he said that he was only given a few minutes to make his decision to plead guilty or go to trial, and, since the "final offer" of pleading guilty was presented on the trial date, "the plea was the product of duress."

At a hearing on this motion, the Defendant's attorney recalled for the trial court how the Defendant took three or four minutes to say the word "guilty" at the guilty plea hearing.  The Defendant's attorney asserted to the court that the Defendant came to court the day of the guilty plea hearing thinking that the case was going to be "discussed" and then possibly set for a jury trial.  The Defendant testified that he did not know what was going on when he entered his guilty plea.  He said that he recalled telling the court that the plea was voluntary, but he agreed that he did not know what was going on in his mind when he said "guilty."  The Defendant said that it took him a while to say the words "guilty," and he agreed that he felt pressure from the State, the trial court, and his attorney to plead guilty.  He also agreed that he felt that it was unfair.  The Defendant said that he would like to be able to "explain [his] situation about the two charges that they've given me and to expect the aggravated -- the robbery charge and the burglary charge."  He testified that he did not know that he was coming to court the day of the guilty plea hearing for a trial.  The Defendant reiterated that he felt pressured to plead guilty, and, had he not been pressured, he would not have pled guilty.

On cross-examination, the Defendant agreed that he was not a stranger to the criminal justice system. He agreed that, previously, he was tried and convicted of attempted second degree murder. On two separate occasions, he had also previously pled guilty to burglary and armed robbery. The Defendant agreed that he understood his rights in terms of going to trial or pleading guilty, but, in this case, he did not know to what he was pleading guilty. The Defendant agreed that he was in court when the trial was set, but he did not know this was his trial date. He testified that it was several hours between when he came to court and when he pled guilty, and during that time his attorney discussed with him that his attorney was ready to go to trial. The Defendant then denied that his attorney told him that there were eleven counts facing him and that the State was willing to let him plead guilty to only two counts. He denied that his attorney told him that he was going to plead guilty to one count of especially aggravated robbery and said that he never found out to what charge he pled guilty. He then said that the trial judge informed him of the charge. He said that the first time he learned about the agreed sentence was when the State announced the agreed sentence. The Defendant said that the trial judge pressured him to plead guilty because the Defendant did not understand the judge's words. He agreed that he told the judge that he understood, but he denied that he actually did understand the proceedings.

The State offered to call the Defendant's trial attorney to rebut some of the Defendant's statements, but the trial court said that calling the attorney was not needed at that time. The trial court took the motion under advisement, and then it denied the motion. It is from this order, that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it denied his motion to withdraw his guilty plea. He asserts that the record is clear that he was reluctant to enter his guilty plea and that he only did so because he was confused and pressured. The Defendant contends that he was "caught off guard" by the anticipated jury trial and that he "did not know about the terms of his plea until he was in the middle of the plea." The State counters that the Defendant has failed to establish that he is entitled to withdraw his guilty plea.

In its order denying the motion, the trial court stated:

The Court finds that the history of the case is as follows:

The Defendant's first appearance in court on this case was the arraignment on July 14, 2004. On that day, the court appointed Patrick Frogge with the Office of the Public Defender, as counsel for the Defendant, who arraigned the Defendant and entered a plea of not guilty on the Defendant's behalf. On August 12, 2004, the Defendant appeared in court for the first discussion date, and the case was continued for two weeks. On August 26, 2004, the Defendant appeared in court for discussion, and the case was continued one week for a hearing on the Defendant's Motion to Sever Offenses. On September 2, 2004, the Defendant was present for the hearing

-6-

on the Motion to Sever Offenses, which the Court took under advisement and denied in its Order of September 16, 2004. On October 8, 2004, the Defendant was present in court when the Court relieved Mr. Frogge based on a conflict of interest, and appointed Michael Colavecchio as counsel. On October 29, 2004, the Defendant was present in court when the Court granted the Defendant's Motion to Continue Trial, and set the case for trial on January 24, 2005.

The Court finds that on January 24, 2005, the witnesses for the state were present and the State was prepared to proceed with trial. The Court also finds that Mr. Colavecchio was prepared to go to trial, however, the Court allowed further negotiations while prospective jurors were being assembled. The Court finds that the Defendant went back and forth over the plea offer for three hours, until the Court informed him that the trial would proceed at 1:00 p.m. The Court finds that shortly before jury selection was to begin, the Defendant accepted the terms of the State's offer and agreed to plead guilty to two counts in the indictment. The court finds, as reflected in the transcript of the plea, that the court explained the following to the Defendant in accordance with Rule 11 of the Tennessee Rules of Criminal Procedure:

. . . .

The Court finds that the Defendant responded under oath that he understood his rights as explained by the Court, and explained to him in the written plea petition bearing his signature. The court finds that the Defendant responded affirmatively that he was pleading guilty out of his own voluntary decision. The Court finds that Mr. Colavecchio was of the opinion that the Defendant's plea was voluntary, and he waived the confrontation of the witnesses. The Court finds that it allowed the State to give a statement of the facts that would have been proven, had the case gone to trial as scheduled.

The trial court then articulated some of the exchange between the court, the attorneys, and the Defendant that occurred at the guilty plea hearing. It then concluded:

The Court is of the opinion that there is not a sufficient basis to establish that the withdrawal of the Defendant's guilty plea is necessary to prevent manifest injustice. The Court finds that the Defendant has failed to establish that he was in any way coerced, intimidated, pressured, misled, or fraudulently induced into entering a plea of guilty. The Court finds that there was no misconduct on the behalf of the Assistant District Attorney General, no misrepresentations, and no withholding of exculpatory evidence which would influence the entry of the plea. The Court finds, as the Defendant testified, that the only pressure the Defendant felt to enter the plea of guilty was brought on after seeing all of the alleged victims sitting in the courtroom prepared to testify against him. The Court is of the opinion that the

Defendant's feelings of pressure and anxiety fall squarely on his shoulders, and were not the product of any misconduct of his attorney, Mr. Colavecchio, or the Assistant District Attorney General.

The Court is further of the opinion that the Defendant's plea was entered into voluntarily, understandingly, and knowingly. The Court finds that the Defendant has a prior criminal history that involves two separate pleas of guilty to felony offenses, and one prior trial of a felony offense. The Court finds that the Defendant has been in this courtroom, regarding this case, six times prior to the date on which the trial was set. The Court finds that the Defendant and Mr. Colavecchio engaged in plea negotiations from approximately 9 a.m. until 1 p.m. on the day of trial, before the Defendant agreed to plead guilty. The court finds that it properly informed the Defendant of his rights, and the consequences of waiving those rights pursuant to the plea, in accordance with Rule 11 of the Tennessee Rules of Criminal Procedure. The Court finds that it accepted the Defendant's plea of guilty. The Court is of the opinion that the Defendant's plea was entered into voluntarily, understandingly, and knowingly, and that there is no basis for the court to set aside the Defendant's plea of guilty.

The withdrawal of a plea of guilty is governed by Rule 32(f) of the Tennessee Rules of Criminal Procedure. This rule states:

A motion to withdraw a plea of guilty may be made upon a showing by the defendant of any fair and just reason only before sentence is imposed; but to correct manifest injustice, the court after sentence, but before the judgment becomes final, may set aside the judgment of conviction and permit the defendant to withdraw his plea.

In this case, the Defendant moved to withdraw his guilty plea after he was sentenced, but before the judgment became final. Therefore, to prevail on his motion, he must show that the guilty plea must be set aside to correct a "manifest injustice." While the term "manifest injustice" has not been defined by statutory or case law, a court may permit the withdrawal of a plea to prevent manifest injustice when the defendant establishes that the plea was not knowingly, understandingly, or voluntarily entered. See State v. Turner, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). A Court should not allow the withdrawal of a guilty plea, however, when the claim of manifest injustice is predicated on "(a) an accused's 'change of heart', (b) the entry of the plea to avoid harsher punishment, or (c) an accused's dissatisfaction with the harsh punishment imposed by the trial court or a jury." Id. The defendant bears the burden of establishing that the plea should be withdrawn. Id. at 353. The determination of whether a plea was entered voluntarily and knowingly is made based on the totality of the circumstances. Id.

"Whether an accused should be permitted to withdraw a plea of guilty is a question that is addressed to the sound discretion of the trial court." Id. Abuse of discretion in this context means there must be no substantial evidence to support the conclusion of the trial court. See Goosby v.

<u>State</u>, 917 S.W.2d 700, 705 (Tenn. Crim. App. 1995) (citing <u>State v. Williams</u>, 851 S.W.2d 828, 830-31 (Tenn. Crim. App. 1992)).

We conclude that the trial court did not abuse its discretion when it determined that the Defendant did not meet his burden of proving that the plea was not knowingly, understandingly, or voluntarily entered. The Defendant has provided bare allegations that he was "confused" and "caught off guard" by the proceedings and that he did not know that he was pleading guilty until the middle of the hearing. We simply cannot agree. As the trial court noted, the Defendant has twice previously pled guilty to felony offenses. The Defendant also went to trial on a third felony offense and was found guilty. Further, the Defendant had been to court six times on the charges listed in the indictments for this case, and he participated in more than three hours of plea negotiations on the day of trial. The trial court ensured through questioning that the Defendant understood his rights and that he was waiving those rights. The Defendant points to his reluctance to say "guilty" as evidence that he did not knowingly enter his plea, however, we consider this proof that he understood the consequences of his admitting his guilt. In light of this evidence presented at the hearings, the trial court properly denied the Defendant's motion to withdraw his guilty plea. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE